IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

TELDRIN FOSTER,

      Defendant.

CRIMINAL ACTION NO.

1:20-cr-296-JPB-CMS

## REPORT & RECOMMENDATION

This case is before the Court on Defendant Teldrin Foster's Motion to Suppress Cell Site Data and Related Evidence.  [Doc. 493].  For the reasons discussed below, I will recommend that this motion be denied.

## I.  BACKGROUND

On March 11, 2021, FBI Special Agent Joseph D. Stites submitted an application and affidavit for information associated with the T-Mobile accounts tied to seven phone numbers, one of which was used by Foster.  [Doc. 493-1 at 1–34 ("Stites Aff.")].

In his affidavit, Special Agent Stites averred that the United States was investigating fraudulent Paycheck Protection Program ("PPP") applications submitted on behalf of eleven companies.  [Stites Aff. ¶ 17].  These eleven businesses received PPP loan funding totaling more than $8.7 million.  [*Id.* ¶ 18].

Special Agent Stites provided details showing that each of the loan applications contained blatant misrepresentations regarding, among other things, the number of employees and the average monthly payroll expenses.  [*Id.* ¶¶ 19–22].

The affidavit provided extensive information about Foster's codefendant, Darrell Thomas, who appears to have been at the center of the scheme.  According to the affidavit, Darrell Thomas's emails implicate Foster in the scheme.  The emails show that Foster, Thomas, and two others "fabricated the supporting documents submitted with the businesses' applications.  For example, these individuals emailed each other various versions of the supporting documentation with changing business names, payroll figures, employee names, and other details."  [*Id.* ¶ 22a].

Special Agent Stites also included facts showing that money laundering activities were occurring in connection with the loan proceeds.  [Stites Aff. ¶¶ 23–34].  According to the affidavit, one of the companies used its fraudulent PPP loan proceeds to purchase luxury vehicles, while other companies paid a substantial portion of their loan proceeds to two of Darrell Thomas's companies—Bellator Phront Group, Inc. ("Bellator") and Elite Executive Services, Inc. ("Elite")—despite having no legitimate business ties to either Bellator or Elite. [*Id.* ¶¶ 23–26].

2

According to Special Agent Stites, a third method of laundering the PPP loan proceeds was through a service called Rapid Pay Card. [Sties Aff. ¶ 27]. Rapid Pay Card allows businesses to issue payroll cards to their employees. Then, rather than paying employees using direct deposit or paper checks, employers can load their employees' pay onto their payroll cards, which can then be used like a debit card. [*Id.* ¶ 28].

The affidavit states that six of the companies who obtained fraudulent PPP loans made large deposits to a Rapid Pay Card account at MetaBank, and the funds then made their way into Bellator's Rapid Pay Card account. [Stites Aff. ¶¶ 27, 29, 30]. According to the affidavit, none of these businesses had any W-2 payroll employees, such that there was no legitimate reason for any of these businesses to make payments to Rapid Pay Card. [*Id.* ¶ 31]. Bank records show that Bellator issued 198 payroll cards to approximately 159 people, even though Bellator reported having only 66 employees on its PPP loan application. [*Id.* ¶ 32]. Moreover, MetaBank's records provided additional indicators of fraud, showing that the amounts deposited onto the payroll cards by Bellator were not consistent with legitimate payroll activity, that the dates the funds were deposited onto the payroll cards by Bellator were not consistent with legitimate payroll activity, and

that many of the payroll cards were used in locations other than where the purported employees lived.  [*Id.* ¶¶ 33–34].

Finally, Special Agent Stites included facts in his affidavit showing why the agents believed that evidence related to the fraudulent loans and laundering of the proceeds would be found in the information provided by T-Mobile.  [Stites Aff. ¶¶ 36–65].  With respect to Foster's phone, the affidavit states:

> 55.   The Target Telephone (678) 559-8218 is believed to be used by TELDRIN FOSTER. Specifically, your Affiant spoke with TELDRIN FOSTER on this number. The service provider is T-Mobile.
>
> 56.   Bellator issued a payroll card in the name of TELDRIN FOSTER. In an interview with your Affiant, TELDRIN FOSTER admitted that he is not a Bellator employee.
>
> 57.   Between July 11, 2020 and August 7, 2020, the payroll card issued to TELDRIN FOSTER was used to make approximately $8,554.10 in purchases and ATM withdrawals at various locations in the Atlanta area, where TELDRIN FOSTER resides.

[Stites Aff ¶¶ 55–57].   The affidavit then provided background information regarding historical cell site information and explained that cell-site data provides an approximate location of the cellular telephone.  [*Id.* ¶ 66].  Special Agent Stites also stated that "disclosure of historical cell-site information . . . will assist investigating agents in determining who used the Rapid Pay Card payroll cards issued to Bellator's purported employees."  [*Id.* ¶ 65].

On March 11, 2021, United States Magistrate Judge Russell G. Vineyard signed the warrant that Special Agent Stites had presented, requiring T-Mobile to provide the Government with the historical cell site data and the other information requested in the application from the accounts associated with the seven phone numbers, for the time period between July 1, 2020 through the processing date. [Doc. 493-1 at 35–40].   And it authorized the Government to seize all such information to the extent it constituted "fruits, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1344 (bank fraud), 1028A (Aggravated Identity Theft), 1956 and /or 1957 (Money Laundering), and conspiracy to commit these offenses . . . ." [*Id.* at 39].

In his motion to suppress, Foster argues that the affidavit did not provide probable cause "as it relates to Mr. Foster's phone information."  [Doc. 493 at 2]. He claims that there was insufficient information: (1) connecting him to any actual use of a Rapid Pay Card; (2) regarding the precise location where the card in his name was used; and (3) explaining why the cell site data would be relevant to the investigation.  [*Id.* at 2–4].

## II.  DISCUSSION

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

place to be searched, and the persons or things to be seized." U.S. CONST. amend.

IV.

With respect to probable cause, "the task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate judge's decision to issue the warrant." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1379 (N.D. Ga. 2012) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)). Probable cause to support a search warrant exists when the totality of the circumstances allows a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). The search warrant affidavit must "state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted). Issuing judges are to employ a practical, commonsense approach to the probable cause analysis and should avoid hyper-technical review of the legitimacy of search warrants:

> In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resultant from warrants issued without probable cause, the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will

6

> be found in a particular place.  Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.  Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.

*United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (internal citations and quote marks omitted).   Reviewing courts accord "great deference" to judicial determinations of probable cause to issue a search warrant.  *United States v. Leon*, 468 U.S. 897, 914 (1984); *Martin*, 297 F.3d at 1317.

In its response brief, the Government succinctly (and in my view, correctly) responds to Foster's argument, as follows:

> The facts described above showed probable cause to believe that Darrell Thomas orchestrated a PPP fraud scheme involving nearly a dozen businesses and used Rapid  Payroll cards to launder more than $3 million in proceeds of those fraudulent loans.  Moreover, the facts established that [Foster] was involved in fabricating documents submitted with various businesses' PPP loans. And they showed that Bellator issued a Rapid payroll card in [Foster's] name (despite [Foster's] admission that he was *not* a Bellator employee), which was used to make more than $8,000 in purchases. As Special Agent Stites explained, the Affidavit established probable cause to believe that cell-site data associated with [Foster's] and others' phones would "assist investigating agents in determining who used the Rapid Pay Card payroll cards issued to Bellator's purported employees."  (Aff. ¶ 65.)

Here, cell-site data would either show that (1) [Foster] himself used the Teldrin Foster payroll card – *i.e.* that he participated in laundering the proceeds of the crime he participated in; *or* (2) [Foster] did not use the Teldrin Foster payroll card – *i.e.* that Darrell Thomas or another individual used a payroll card in another individual's name to launder the proceeds of the PPP fraud.  Indeed, the Affidavit explained that Darrell Thomas may have in his possession payroll cards issued to Bellator's purported employees.  Whether [Foster's] cell-site data showed that he used the Teldrin Foster payroll card or not, it would provide evidence of the crimes under investigation, including money laundering and/or aggravated identity theft.

[Doc. 533 at 10–11].

Foster tries to draw a distinction between evidence related to Darrell Thomas and evidence related to him, saying "whether there was sufficient probable cause to obtain information related to Darrell Thomas is not the point.  Instead, the issue is whether there was probable cause to support the warrant as it related to Mr. Foster."  [Doc. 597 at 1].  I disagree.

The Affidavit includes facts directly tying Foster to the scheme, stating that Foster participated in fabricating documents accompanying the PPP loan applications.  [Stites Aff. ¶ 22(a)].  That fact, in conjunction with a payroll card issued in Foster's name, establishes probable cause to believe that Foster received and used a Rapid Payroll card as part of the conspiracy.  But even if Foster did not use the card, the historical cell site information could still be evidence of money laundering and/or aggravated identity theft against Darrell Thomas or other

individuals.  It was not necessary for Special Agent Stites to state a probable cause basis to believe that Foster committed any of the crimes under investigation. Rather, he had to show only that there was probable cause to believe that evidence of a crime—not evidence related to a specific criminal—would be found in the data and information described in the warrant.

While it was not a certainty that evidence of the enumerated crimes would be discovered in the historical cell site information associated with Foster's T-Mobile account, the "totality of the circumstances" makes it probable that such evidence would be found, and that is all that the law requires.  *United States v. Brundidge*, 170 F.3d at 1352.  It is evident that Judge Vineyard followed the law, used a commonsense, practical approach, and correctly found that there was probable cause to believe that the requested searches would yield evidence of violations of law.

### III.  CONCLUSION

For the reasons discussed above, I **RECOMMEND** that Foster's Motion to Suppress Cell Site Data and Related Evidence [Doc. 493] be **DENIED**.

**IT IS SO RECOMMENDED**, this 17th day of February, 2023.

CATHERINE M. SALINAS
United States Magistrate Judge